## DECLARATION IN SUPPORT OF VERIFIED COMPLAINT

Under 28 U.S.C. § 1746, I, Task Force Officer ("TFO") Anthony Johnson, Drug Enforcement Administration ("DEA"), United States Department of Justice, make the following unsworn declaration, under the penalty of perjury, pertinent to the complaint to which this declaration is attached:

### I.  Introduction

1. This declaration is made in support of a Verified Civil Complaint for forfeiture of property seized pursuant to a valid traffic stop and commercial vehicle inspection. The **Defendant Property** is subject to forfeiture under 21 U.S.C. § 881, 18 U.S.C. §§ 981(a)(1)(A) and (C), and 31 U.S.C. §§ 5317 and 5332(c) because the **Defendant Property** is involved in or constitutes the proceeds of drug trafficking and/or was being transmitted by courier, in violation of 21 U.S.C. §§ 841 (drug trafficking) and 846 (drug conspiracy), and 18 U.S.C. §§ 1956(a)(1) (money laundering), 1956(h) (money laundering conspiracy), 31 U.S.C. § 5332 (bulk cash smuggling), and/or 1960 (unlicensed money transmitting businesses).

2. This declaration is based upon my personal knowledge and experience obtained as case agent and information I have received from other law enforcement officials. The information contained in this declaration is based on my participation in this investigation and statements made by witnesses, information given to me by other law enforcement officers, the results of physical and video surveillance, review of consensually recorded conversations, law enforcement reports, review of subpoenaed records and information provided to me by non-law enforcement personnel.

3. Unless otherwise noted, wherever in this declaration I assert that a statement was

**EXHIBIT A**

made, the information was provided by others with whom I have spoken or whose report I have reviewed. Such statements are not reported in their entirety or verbatim, unless otherwise indicated.

4. Because this declaration is being submitted for the limited purpose of establishing my reasonable belief that the United States will be able to meet its burden of proof that the **Defendant Property** is the proceeds of drug trafficking and/or involved in money laundering, I have not set forth every fact learned during the investigation, nor is this declaration intended to be a complete and detailed description of all events and conversations occurring during the course of the investigation.

**II.    Declarant's Background and Experience**

5. I have been employed as a DEA TFO since July 2021 and am currently assigned to the Hattiesburg Post of Duty located in Hattiesburg, Mississippi. I have participated in investigations of illegal narcotics trafficking and violations of the Controlled Substances Act, 21 U.S.C. § 801, *et seq*. In addition to being a TFO, I have been a Mississippi Bureau of Narcotics ("MBN") agent since September 2014. I completed a six-week training program at the MBN Academy in Pearl, Mississippi. My training has included narcotics investigations, hotel, motel, and parcel interdiction, drug search warrants, financial investigations related to drug trafficking, money laundering, asset forfeiture and seizure, and social media analysis. In addition, I have been a sworn law enforcement officer in the State of Mississippi since 1996 and have completed multiple training programs to include the ten-week Basic Law Enforcement Officers Training Academy program and the Mississippi Certified Investigators Program.

**EXHIBIT A**

6. I have participated in and conducted a multitude of investigations which have led to the arrest and conviction of individuals who have been involved in the smuggling, receiving, and distribution of controlled substances, as well as the seizure of illegal drugs and proceeds derived from the sale of those illegal drugs. In addition, I have conducted, in connection with these and other cases, investigations concerning the concealment of narcotics-produced assets and the identification of co-conspirators through ledgers, telephone bills and records, and photographs, as related to drug trafficking. I have been involved in various types of electronic surveillance, in the writing and execution of search warrants, and in the debriefing of defendants, witnesses and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, and of the laundering and concealing of proceeds from the trafficking of controlled substances.

7. Since my assignment as a DEA TFO, I have participated in debriefing dozens of defendants, informants, and witnesses who had personal knowledge about narcotics, narcotics trafficking, and methods of narcotics distribution. I have participated in all aspects of a drug investigation, including conducting surveillance, executing search warrants, executing arrests, working with confidential informants, and using court-ordered eavesdropping devices. As a result of my assignment, and by virtue of my employment as a law enforcement officer, I have performed and continue to perform various duties, which include but are not limited to:

    a. Working in an undercover capacity to purchase drugs from wholesalers of illegal narcotics;

    b. Working as a surveillance agent to detect and record movement of persons known to be or suspected of being involved in illegal drug trafficking; and

    c. Working as a case agent, directing investigations of various illegal drug traffickers and their organizations, and investigations

**EXHIBIT A**

  involving complex conspirators in which numerous drug traffickers, located in various states and foreign countries, were illegally importing, possessing, and distributing illegal drugs within the United States.

8. Through training and experience, and through the training and experience of other narcotics agents with whom I have talked, I have learned the following:

  a. That criminal organizations, including large-scale drug traffickers, maintain and handle large amounts of United States currency in order to finance their ongoing illicit businesses;

  b. That it is common practice for large-scale drug traffickers to secrete contraband, proceeds of drug sales, and records of drug transactions in locations within their residences, vehicles, and/or place of business to conceal them from law enforcement authorities;

  c. That persons involved in large-scale drug trafficking conceal in their residences, vehicles and businesses caches of drugs, large amounts of currency, and evidence of financial transactions relating to the obtaining and secreting of large sums of money acquired from engaging in narcotics-trafficking activities;

  d. That it is a common practice for large-scale drug traffickers to travel to distribution areas to facilitate their trafficking; that after purchasing drugs, the drug trafficker will transport, or cause to be transported, drugs to other areas for distribution; and that the methods of transportation include, but are not limited to, rental and private automobiles;

  e. That, knowing the significant number of commercial trucks crossing the U.S./Mexico and Canada borders, and the impossibility of inspecting every truck, large-scale drug traffickers often use commercial trucks as cover for drug and bulk cash shipments, which also allow for larger volumes of cargo to be shipped;

  f. That traffickers use vacuum-sealed bags, aluminum foil, tape and/or rubber bands to bundle their illegal proceeds for transport back to Mexico or source destinations. By vacuum sealing the money, drug traffickers attempt to make it difficult for law enforcement canine units to detect trace amounts of illegal drugs, which have touched the drug proceeds and by vacuum sealing

4

**EXHIBIT A**

and/or using tape to package the proceeds, it condenses the package of bulk currency, allowing it to be more easily concealed. The bundled cash may be concealed in clothing or luggage or hidden in mechanical or electronic traps within the vehicle, depending on the sophistication of the smugglers' organization;

g. That money couriers, individuals specializing in the transportation of money rather than narcotics, take a percentage of the illegal proceeds that they transport;

h. Drug and/or money couriers, also called "mules," are solicited by drug traffickers to transport drugs/money between source cities and distribution cities. These subjects are recruited based on their normal, unremarkable appearance, lack of criminal record, and possession of a valid driver's license to thwart law enforcement detection. Use of mules also limits law enforcement's ability to identify the source of the drugs or money, because the use of the mules allows the source to disassociate themselves from the drugs or money. Mules create fictitious stories to explain the purpose of their trip and—if the currency is found—why they are carrying large sums of cash;

i. That, generally, illegal drugs are transported from Mexico into the United States, while drug proceeds are transported from the United States into Mexico;

j. That couriers for drug traffickers continually buy, trade, and sell vehicles in an attempt to elude law enforcement; that couriers believe by obtaining a newly registered vehicle (or using a vehicle registered to another person), any past wrongdoings or information obtained by law enforcement will not be found;

k. That it is common practice for drug traffickers to pay their couriers based on the type and amount of narcotics and/or the amount of narcotics proceeds transported; and that because new couriers are not normally trusted with bulk currency or bulk narcotics, if a courier is found in possession of bulk currency or narcotics, it is often an indicator that the courier is well established and trusted within an organization;

l. That couriers for drug-trafficking organizations often use multiple cellular phones, which are often prepaid phones, as they are typically inexpensive and can be easily disposed of and harder to trace to a specific individual. Much like continually changing

5

**EXHIBIT A**

        vehicles and registrations, couriers and drug traffickers believe changing cellular phones will help elude law enforcement;

l.     That money couriers and those with illegally obtained proceeds often attempt to justify their possession of bulk currency by claiming that the currency is the proceeds of legal cash-based self-employment. Such individuals are often unable to substantiate their claims with business records;

m.    That, in addition to the scents of other drugs, drug-sniffing dogs are trained to alert to the smell of methyl benzoate, a compound formed when cocaine hydrochloride hydrolyzes in moist air; and

n.     That the Courts have recognized unexplained wealth is probative evidence of criminal violations by pecuniary gain, in particular trafficking in controlled dangerous substances (*see United States v. Barnes*, 604 F.2d 121, 147 (2 Cir. 1979)).

**III.**    **Items to be Forfeited to the United States of America**

9.     The following property (collectively, the "**Defendant Property**") [1]

| Asset ID | Asset Description |
|---|---|
| 22-DEA-696928 | $3,097.00 U.S. Currency seized from Eddy Cabrera-Garcia |
| 22-DEA-696929 | $3,558.00 U.S. Currency seized from Lazaro Castro-Gonzalez |
| 22-DEA-696932 | One (1) 2012 Peterbilt Semi-Tractor Truck, Model 386, white, VIN: 1XPHD48X9CD158641, bearing Florida license plate JD9QS, registered to and titled to Eddy Cabrera-Garcia and marked with AR Translogistics LLC and a USDOT number of 3629338 and MC-1246733 on the step below the doors (the "Peterbilt") |

is sought for forfeiture as a result of a September 20, 2022 traffic stop on Interstate 59 southbound near Mile Marker 1 in Pearl River County, Mississippi (collectively, the "**Defendant Property**").

---

[1] An additional sum of money was seized from Lazaro Izquierdo-Crespo. This sum, $3,873.00 U.S. Currency (22-DEA-696931), is in the process of being administratively forfeited. The complaint will be amended to add 22-DEA-696931 should that prove necessary.



### IV. Facts and Circumstances

10. On Tuesday, September 20, 2022, at approximately 2:00 p.m., I arrived on scene at the rest area for I-59 northbound at Mile Marker 1 in Picayune, Pearl River County, Mississippi in reference to assisting the Department of Public Safety ("DPS") Commercial Transportation Enforcement Division ("CTED") Officers William Twiner and Officer Courtney Porter and Mississippi Highway Patrol Trooper Ron Bridges with the arrests of Eddy Cabrera-Garcia ("Cabrera"), Lazaro Izquierdo-Crespo ("Izquierdo"), and Lazaro Castro-Gonzalez ("Castro") for possession of methamphetamine (in violation of Mississippi Code § 41-29-139).

11. Officer Twiner stated that he had stopped a white 2012 Peterbilt Tractor Truck with no trailer, for failure to stop at the inspection station (in violation of Mississippi Code § 63-5-49) at the I-59 northbound inspection station at Mile Marker 1 in Picayune, Pearl River County, Mississippi. Upon stopping the Peterbilt at the rest area, Officer Twiner approached the driver, Cabrera, in order to address his failure to stop at the inspection station, and to perform a Level 3 inspection[2]. Officer Twiner asked for the 2012 Peterbilt's logbook[3]. Cabrera stated that there was no logbook in the vehicle.

---

[2] CTED has 3 levels of inspections, with Level 1 as the most in-depth, and Level 3 as the least intrusive. A Level 3 inspection involves checking paperwork and driver information, but the level of inspection is at the discretion of the officer. There is no requirement for probable cause. Most Level 3 inspections are routine and can be done at any time at an inspection station or even just a random stop with the purpose of the inspection being cause of the stop.

[3] Federal and State Law require truck drivers to keep a logbook in their truck unless they live within 150 miles of their home base (*i.e.*, where the truck is parked). CTED performs logbook inspections under the authority of U.S. Department of Transportation Regulation § 395.8A.



**EXHIBIT A**

Officer Twiner then noticed two individuals—identified as being Castro and Izquierdo—hiding under a blanket in the Peterbilt's sleeper cab. Cabrera, Izquierdo, and Castrol are Cuban nationals and were lawfully present in the United States.

12. Officer Porter arrived on scene at approximately 2:12 p.m. and Trooper Bridges arrived on scene at 3:14 p.m. to assist Officer Twiner. Officer Twiner had learned by this time that the Peterbilt had never received an inspection, nor had any of AR Translogistics LLC's trucks in the United States ever been inspected since the company had gone into operation. Cabrera signed a Spanish-language consent form authorizing the search of the Peterbilt.

13. Officer Twiner and Trooper Bridges began searching the Peterbilt. Officer Twiner began searching the front part of the cab and noticed some screws around the glove box with tool marks. He then found a black plastic bag behind and to the right of the glove box in the wall of the Peterbilt's dashboard. The plastic bag contained two cell phones wrapped in a blue towel.

14. Trooper Bridges, searching the Peterbilt's sleeping cabin, found a GPS Signal Detector/Portable Signal Jamming Device[4] between the bed sleeper and the floor speaker. Trooper Bridges also found a clear plastic bag with approximately 9 grams of a white crystalline substance and white powder believed to be methamphetamine hidden in a wall panel of the Peterbilt's sleeping cabin.

15. Continuing the search, Officer Twiner found—hidden in the driver's

---

[4] Cabrera's (and his companions') purpose in possessing this device is currently unknown, but it was interfering with law enforcement officers' cell phone and laptop equipment during the traffic stop.

**EXHIBIT A**

visor—a piece of rubber glove with a folded dollar bill containing approximately 1.13 grams of a crystalline substance believed to be methamphetamine.[5]

16. Trooper Bridges located a post-manufacture hidden compartment in the back wall of the sleeper cabin. The compartment ran longways the full width of the back of the sleeper cabin and measured approximately 3 feet wide by 6 inches high and less than 5 inches deep. The compartment had been made using the air duct of the back wall. The compartment was only accessible after removing the Peterbilt's cabin bed and wall.

17. Cabrera, Castro, and Izquierdo were arrested for possession of a controlled substance (methamphetamine/ice). As described in paragraph 9, Cabrera, Castro and Izquierdo each also possessed bulk United States Currency at the time of their arrests.

18. Officer Twiner and I seized bulk currency from Cabrera, Castro, and Izquierdo. Each sum of bulk currency was then placed into a separate MBN Evidence Bag and sealed. Each bag was then initialed by Officer Twiner, myself, and the man from whom that sum of bulk currency had been seized.

19. Cabrera, Castro, and Izquierdo were transported to the Pearl River County Jail in Poplarville, Pearl River County, Mississippi and each booked on the charge of possession of a controlled substance (methamphetamine/ice). Cabrera was also booked on several Department of Transportation violations.

20. The Peterbilt was towed by HX4 Towing to the towing company's lot in Poplarville, Pearl River County, Mississippi, where Trooper Bridges, Officer Twiner, and I continued to search the Peterbilt. I observed that the Peterbilt's passenger-side fuel tank

---

[5] An additional amount of methamphetamine was found the next day in Cabrera-Garcia's wallet during a property inventory of Cabrera's, Izquierdo's, and Castro's belongings.

**EXHIBIT A**

was clean of dirt and debris and that one of the bolts connecting the gas tank to the Peterbilt's frame was clean and appeared to be recently screwed together. The same screws on the driver's side of the Peterbilt were dirty and rusted over.

21. Furthermore, a lack of grease and wear and tear on the fifth-wheel connection suggested that the Peterbilt had not been used to pull a trailer in a long time. Certain parts of the lower portion of the Peterbilt were cleaner than the rest of the truck, as if sections had only been cleaned as needed.

22. On the underside of the Peterbilt's frame, officers located a black box that contained an Apple I-Tag, which are often used by drug trafficking organizations to track couriers and their cargo of drugs and/or cash.

23. Considering the Peterbilt's hidden compartment, the DEA placed a hold on the vehicle due to the probability that it had been used to facilitate the transportation of illegal controlled substances, currency or other illicit purposes.

24. On September 20, 2022, law enforcement officers confirmed that AR Translogistics LLC—the company identified on the Peterbilt—had never had any of its vehicles inspected by the U.S. Department of Transportation. I also learned that Customs and Border Protection ("CBP") had previously seized money from Cabrera, in 2018.

25. Cabrera, Izquierdo, and AR Translogistics all have multiple connections to associates and other businesses with a history or drug trafficking and other criminal activity, and/or under investigation for the same. In fact, I discovered that one of AR Translogistics' two reported addresses, 1730 Oak Breeze Avenue, Kissimmee, Florida, is also the listed address for more than ten businesses, most of which are trucking



companies believed to be shell companies engaged in illicit activity, including transporting illegal narcotics and currency.

26. I learned that Cabrera had approximately 73 border crossings between August 26, 2014 and July 16, 2022, mostly via flights to and from José Martí International Airport in Havana, Cuba, one of multiple Caribbean locations that functions as a hub for cocaine distribution coming from Columbia. Izquierdo, who had been convicted in 2009 for manufacturing/cultivating marijuana, had crossed the border at the Brownsville Point of Entry in Texas in 2007. Castro had 19 border crossings, with 3 of them at Nassau International Airport in the Bahamas, 1 at José Martí International Airport in Havana, Cuba, and 1 to Istanbul International Airport. The Peterbilt had been observed in Laredo, Texas on April 12, 2022 and had passed through a Customs and Border Protection Checkpoint in Falfurrias, Texas on September 19, 2022.

27. The other law enforcement officers and I seized the Defendant Property as proceeds of narcotics trafficking and/or involved in or facilitating narcotics trafficking, as determining that we had probable cause of a direct correlation between the currency and distribution of controlled substances. This determination was based on—and substantiated by—multiple factors, including: (1) the amounts of U.S. Currency seized from each of the individuals in the Peterbilt was consistent with amounts given to couriers as expenses and/or collectively, consistently with bulk currency smuggling; (2) the hidden compartment in the Peterbilt's sleeper cab was consistent with the practices of narcotics traffickers; (3) the possession of methamphetamine by Cabrera, Izquierdo, and Castro; (4) Cabrera's and AR Translogistics' efforts to avoid inspection of the Peterbilt

**EXHIBIT A**

and other company vehicles; (5) the fact that Izquierdo and Castro were hiding in the Peterbilt's sleeping cab; (6) the hiding in the Peterbilt devices commonly used by drug traffickers to facilitate and monitor drug and money mules; (7) Castro's history of a cash seizure by CBP in 2018; (8) Cabrera's, Izquierdo's,, and AR Translogistics' connections with drug-trafficking organizations and other criminal activity; (9) Cabrera's, Izquierdo's, and Castro's international travel to destinations known for their involvement in the illegal drug trade; and (10) Izquierdo's 2009 conviction for manufacturing/ cultivating marijuana.

28. On September 23, 2023, I transported the U.S. Currency assets of the **Defendant Property** to the First Bank in Gulfport, Mississippi. The official counts of these assets were $3,097.00 and $3,558.00, which was converted to cashier's checks to be processed and secured with the U.S. Marshals Service.

29. On December 12, 2022, Cabrera filed an administrative claim—*pro se*—for 22-DEA-696928 and 22-DEA-696932, alleging that he was owner of both that sum of cash and the Peterbilt, and that he is an owner operator who "haul[s] for a company and [is] paid by that company." Cabrera denied using "illegally obtained funds" to purchase or make payments on the Peterbilt and stated that the U.S. Currency was his personal money, used to pay for fuel and potential repairs and emergencies.

30. The DEA sent Izquierdo notice of its intent to administratively forfeit 22-DEA-696931, but he failed to file a claim and the time for doing so has lapsed. DEA failed to initiate administrative forfeiture for 22-DEA-696929, and it is included herein.

**EXHIBIT A**

## V. CONCLUSION

31. In conclusion, the results of this investigation support my reasonable belief that the government can meet its burden of proof that the **Defendant Property** is directly related to and/or derived from the illicit distribution of controlled substances. This determination was made on the facts and circumstances presented above.

32. I believe, based on the above-listed facts and circumstances, that there was probable cause to seize the **Defendant Property** and that the United States will meet its burden of proof to forfeit **Defendant Property**. I reasonably believe that the money was intended to facilitate or used to further a drug crime, or is directly related to drug proceeds of Cabrera, Castro, and/or their associates, in violation of 21 U.S.C. § 841 (drug trafficking) and § 846 (drug conspiracy), 18 U.S.C. § 1956(a)(1) (money laundering), 18 U.S.C. § 1956(h) (money laundering conspiracy), 31 U.S.C. § 5332 (bulk cash smuggling), and/or 18 U.S.C. § 1960 (unlicensed money transmitting businesses), and is therefore subject to forfeiture to the United States of America under 21 U.S.C. § 881, 18 U.S.C. §§ 981(a)(1)(A) and (C), and 31 U.S.C. §§ 5317 and 5332(c).

33. I declare, pursuant to 28 U.S.C. § 1746, that the foregoing is true and accurate to the best of my knowledge and belief.

Executed this 21 day of February 2023,

Anthony Johnson
Task Force Officer
Drug Enforcement Administration

13

**EXHIBIT A**